# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-3527

———————

| | | |
|---|---|---|
| William C. Edmund, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | On Appeal from the |
| | * | United States District Court |
| | * | for the Southern District |
| MidAmerican Energy Company; | * | of Iowa. |
| MidAmerican Energy Holding | * | |
| Company; Jack Alexander, | * | |
| | * | |
| Appellees. | * | |

———————

Submitted: June 13, 2002

Filed: August 5, 2002 (Corrected: August 7, 2002)

———————

Before WOLLMAN, RICHARD S. ARNOLD, and LOKEN, Circuit Judges.

———————

RICHARD S. ARNOLD, Circuit Judge.

William Edmund appeals a decision of the District Court[1] granting summary judgment in favor of MidAmerican Energy Company, MidAmerican Energy Holding

---

[1] The Hon. Ross A. Walters, Chief Magistrate Judge, United States District Court for the Southern District of Iowa.

Company, and Jack Alexander on Mr. Edmund's claim of sex discrimination. Mr. Edmund contends that he first was demoted and then was passed over for a promotion because of his sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and the Iowa Civil Rights Act of 1965, Iowa Code §§ 216.1–216.20. We affirm.

I.

We commend the District Court for its thorough recitation of the facts, which we summarize here. Mr. Edmund has been employed by MidAmerican Energy Company and its predecessor company, Iowa-Illinois Gas & Electric Company, for more than thirty years. J.A. 421. In 1995, Mr. Edmund became Manager of Compensation in the human resources department of the Des Moines office, reporting to David Levy, Vice President of Human Resources and Information Technology. J.A. 142, 414. In May 1996, Jack Alexander took over Mr. Levy's responsibilities as manager of the human resources department, and, in November of that year, he formally acquired Mr. Levy's old title of Vice President of Human Resources and Information Technology. J.A. 134. In both capacities, Mr. Alexander maintained direct supervisory authority over the entire human resources department, including Mr. Edmund. Id.

When Mr. Alexander took over responsibility for the human resources department from Mr. Levy, Mr. Levy cautioned him that "if he wanted compensation to go in a new direction, Bill Edmund would not be the best person to lead those changes." J.A. 415. In about May 1996, Phil Linder, Mr. Alexander's supervisor, complained to Mr. Alexander about Mr. Edmund's resistance to a corporate decision to discontinue certain loans to former employees of Iowa-Illinois. J.A. 145, 195. Around the same time, Mr. Alexander also received complaints that Mr. Edmund relied too much on electronic means of communication. J.A. 145-46, 149, 191-92.

In 1997, Jodi Stevens, a payroll supervisor who reported to Mr. Edmund, complained to Mr. Alexander that Mr. Edmund did not understand "what was going on in payroll." J.A. 147. Ms. Stevens's successor, Michele Book, complained that Mr. Edmund was not accessible, overused e-mail, and failed to provide strategy to the payroll department. J.A. 147-48, 153. In 1997-98, John Capello, a senior vice president for marketing and sales, informed Mr. Alexander that Mr. Edmund did not understand what Mr. Capello wanted in terms of a new compensation and salary structure for the marketing and sales group. J.A. 148-49. As a result, Mr. Capello hired an outside consultant, David Camner, to assist in developing the plan. Id.

Mr. Camner provided Mr. Alexander with his impressions of various people within human resources, including Mr. Edmund. J.A. 149-51. With the caveat that his assessment was "anecdotal information based on insufficient information and may not be accurate," Mr. Camner stated that Mr. Edmund had "[g]ood analytical skills but [was] less effective at understanding the 'big picture.'" J.A. 355. Mr. Alexander did not show the report to Mr. Edmund. J.A. 150.

Senior Vice President and General Counsel John Rasmussen complained to Mr. Alexander that Mr. Edmund was resisting the upgrade of a particular senior attorney's position, an upgrade that Mr. Rasmussen and other senior officers of MidAmerican desired. J.A. 161-62, 416. Russ White, Manager of General Services, and Alan Wells, Senior Vice President for Finance and Chief Financial Officer, also complained to Mr. Alexander regarding Mr. Edmund's resistance to their attempts to upgrade certain employees. J.A. 162-63. Mr. Wells complained that Mr. Edmund was a "roadblock" who did not provide constructive solutions. Id. at 162. Ron Stepien, President of MidAmerican, told Mr. Alexander that he no longer wanted to meet with Mr. Edmund regarding compensation issues because he believed Mr. Edmund was overly technical and failed to solve problems. J.A. 163, 419-20.

3

In 1998, Mr. Rasmussen informed Mr. Alexander that he and Mr. Stepien had concluded that they did not want Mr. Edmund to testify for the company before the Iowa Utilities Board regarding a requested rate increase because they did not believe that Mr. Edmund could persuasively and credibly articulate the company's position. J.A. 186, 417. Mr. Alexander had recommended that Mr. Edmund be the company's witness. J.A. 186.

In 1998, Sue Rozema, Vice President of Financial Services, asked Mr. Alexander to replace Mr. Edmund on a committee that she oversaw because, she said, he had been "obstructionist and negative" in a committee meeting. J.A. 199. Charles Snider, one of Mr. Edmund's subordinates, complained to Mr. Alexander that he thought that a report that Mr. Edmund had prepared—analyzing compensation within the human resources department and recommending only two positions, including Mr. Edmund's own, for an upgrade—was biased. J.A. 310, 314-16.

Mr. Alexander did not conduct any performance reviews for employees in the human resources department until April 1998. J.A. 148, 363, 367, 371. On April 29, Mr. Alexander gave Mr. Edmund a "leadership skills assessment," or performance review, that was mostly negative and mixed and included various of the complaints that Mr. Alexander had received. J.A. 371-72. Mr. Alexander criticized Mr. Edmund as "too reactionary," "resistant to change," not "proactive," and lacking leadership skills. Id. Prior to the review, Mr. Alexander had not communicated the complaints about Mr. Edmund to him. J.A. 424.

On November 1, 1998, Mr. Alexander was promoted to Senior Vice President of Energy Delivery, and his supervisory responsibility over human resources ended. J.A. 134. On that date, Keith Hartje took over as head of human resources. J.A. 134, 275. Mr. Hartje became dissatisfied with Mr. Edmund's work in bringing together MidAmerican's compensation system with the system of CalEnergy Company, a company with which MidAmerican planned to merge in early 1999. J.A. 286. In

December 1998, a committee was formed to develop the compensation and benefits system for the merged company. J.A 286. Mr. Hartje appointed Maureen Sammon to be head of the committee, id., and Mr. Edmund was not placed on the committee. J.A. 264-65.

On January 28, 1999, Mr. Hartje made a written evaluation of Mr. Edmund's performance, noting that he was perceived as "reactive," "resistant to change," and without strategic thinking skills. J.A. 388-92. He concluded that, following the merger, Mr. Edmund would be demoted from manager of compensation to senior compensation analyst, a position that, he determined, would make the best use of Mr. Edmund's technical and analytical skills. J.A. 392. On the basis of his appraisal of Mr. Edmund's performance and the concerns of MidAmerican's senior management regarding Mr. Edmund, Mr. Hartje concluded that Mr. Edmund was not the right person for the job. J.A. 280-81.

Mr. Hartje told Mr. Alexander of his decision to demote Mr. Edmund a week or ten days before he informed Mr. Edmund of the decision. J.A 288. He testified that he made the decision on his own, not at the request of or due to the influence of Mr. Alexander. Id.

In early February 1999, Mr. Hartje removed the responsibility for MidAmerican's payroll function from Mr. Edmund and gave it to Jodi Bacon because she had been involved in converting the payroll system to a new computer system. J.A. 205-07, 293.

On March 12, 1999, Mr. Edmund was demoted. Duke Vair, a human resources representative with MidAmerican's merger candidate, CalEnergy, was given Mr. Edmund's former position. J.A. 280-81. In May 1999, after about a month and a half as manager of compensation, Mr. Vair resigned and left MidAmerican. J.A. 346. Mr. Hartje appointed Maureen Sammon, who had a master's degree in business

administration, J.A. 301, and two years of experience within the human resources department but no experience regarding compensation or payroll, to replace him. J.A. 291. Ms. Sammon was appointed to be Manager of Compensation and was given the title of Manager of Compensation, Benefits, and Human Resources Information Services. J.A. 290. Mr. Edmund was not considered for the position. J.A. 291.

When Mr. Alexander became head of the human resources department, the department consisted of ten men and twenty-nine women. During his tenure, five men were demoted and one was hired. Over that period, six women were promoted and five others were hired, while one was fired. Of those individuals who reported directly to Mr. Alexander when he took over as head of human resources, two were women and four were men. When he left, five were women and two were men. Appellant's Brief at 2-3.

## II.

We review a district court's grant of summary judgment de novo. Anderson v. Franklin County, 192 F.3d 1125, 1131 (8th Cir. 1999). Summary judgment is proper when there is no genuine issue of material fact and, when the evidence is viewed in the light most favorable to the nonmoving party, Bailey v. United States Postal Serv., 208 F.3d 652, 654 (8th Cir. 2000), the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Mr. Edmund contends that the decision to demote him from Manager of Compensation to Senior Compensation Analyst and the decision not to consider him for a promotion once Mr. Vair resigned (to the position filled by Ms. Sammon) discriminated against him on the basis of sex. Although both decisions were made by Mr. Hartje, the only person Mr. Edmund alleges acted with discriminatory intent is Mr. Alexander. Mr. Edmund argues that Mr. Alexander, not Mr. Hartje, in fact made the decision to demote him, and that Mr. Alexander both provided distorted

6

information to Mr. Hartje and failed to support plaintiff when others complained about him, thereby causing Mr. Hartje not to consider him as a viable applicant for the position filled by Ms. Sammon.

We evaluate Mr. Edmund's claims under the burden shifting framework of McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802-03 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of unlawful discrimination, after which the defendant has the burden of articulating a legitimate nondiscriminatory reason for its action, following which the plaintiff has the burden of producing sufficient evidence to allow a reasonable factfinder to conclude that the defendant's asserted reason is not the true, legitimate reason but a pretext for discrimination. We bear in mind that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. As the District Court noted, citing Hamer v. Iowa Civil Rights Commission, 472 N.W.2d 259, 263-64 (Iowa 1991), and as no party disputes, claims brought under the Iowa Civil Rights Act are analyzed in essentially the same fashion.

At the outset, we note several potential problems with Mr. Edmund's prima facie case. First, there is the issue of Mr. Alexander's role in the allegedly discriminatory decisions. Regarding the demotion decision, Mr. Edmund cites the testimony of Mr. Vair and the testimony of Sally Stetson, a recruiter whom Mr. Alexander contacted, to argue that Mr. Alexander, not Mr. Hartje, made the decision to demote him and that the decision was made in October 1998, not in January 1999. Although this evidence does provide support for Mr. Edmund's theory regarding Mr. Alexander's involvement, it is not, as the District Court noted, helpful to Mr. Edmund's case. "That Alexander planned to replace Edmund with Vair, another male, because a stronger compensation manager was wanted is not evidence of gender bias and is inconsistent with pretext." J.A. 114 n.2. Regarding the failure-to-

7

promote decision, which was made by Mr. Hartje six months after he took over as head of human resources department, Mr. Edmund asks us to hold that a reasonable factfinder could determine that Mr. Hartje's seemingly independent assessment of Mr. Edmund was "rooted in the opinions and perceptions" of Mr. Alexander. Appellant's Brief at 34.

Despite these somewhat dubious propositions, we will assume, as did the District Court, that Mr. Edmund has met his prima facie burden regarding both demotion and failure to promote. We agree with the District Court that the defendants have met their burden of articulating a legitimate nondiscriminatory reason for their decisions, namely that Mr. Edmund did not possess the qualities they looked for in a manager of the combined compensation systems of MidAmerican and CalEnergy to the degree that Mr. Vair and Ms. Sammon did. Thus, the question is whether Mr. Edmund has raised sufficient evidence for a reasonable jury to determine that the defendants' asserted justification was pretextual.

The District Court concluded that Mr. Edmund presented insufficient evidence to infer that Mr. Alexander acted with discriminatory motive and, therefore, that Mr. Edmund presented insufficient evidence to conclude that any of the defendants discriminated against him on the basis of sex. Mr. Edmund raises several challenges to that conclusion.

First, Mr. Edmund argues that the District Court failed to give sufficient weight to his statistical evidence of discrimination, which he argues "is admissible as probative circumstantial evidence of pretext to be considered with all other evidence of pretext." Appellant's Brief at 17. But there was no dispute as to the admissibility of the evidence, only as to its probative weight. Thus, this argument has little force.

Regarding the weight of the statistical evidence, the District Court looked closely at the evidence concerning each of the employment decisions made during

8

Mr. Alexander's tenure. As to the hiring of five women, the Court determined that the evidence indicated that Mr. Alexander was not a primary decisionmaker for two. For the other three, the Court determined that the evidence indicated that an outside search firm and other management employees were involved in the decisions, though the final decisions were made by Mr. Alexander. Regarding the hiring of one man, the Court determined that Mr. Edmund did not provide evidence for his claim that Mr. Alexander actually preferred a woman for the position. Concerning the promotion of six women, the Court concluded that the evidence indicated that five of the promotions were made by or recommended by persons other than Mr. Alexander. Regarding the demotion of three men, the Court concluded that the evidence indicated that two were for performance reasons. The Court also stated that Mr. Edmund did not provide evidence regarding the number of women fired. J.A. 115-17.

Mr. Edmund quibbles with parts of the District Court's analysis. Citing to pages 176-77 of the Joint Appendix, he asserts that Mr. Alexander admitted in his deposition that he made the decision to approve the transfer of Judy Bohrofen. However, nothing on these pages so indicates. He does assert, correctly, that there was some evidence that Mr. Alexander was considering (and may have preferred) a female candidate to the one male candidate ultimately hired. J.A. 425, 165-66 He also asserts that the Court erred in stating that he had failed to provide the number of women fired during Mr. Alexander's tenure, when in fact he had stated that one woman was fired. J.A. 64, 424-25. These minor discrepancies hardly call into question the District Court's conclusion.

Mr. Edmund also argues that the District Court erred in concluding that he failed to provide evidence that any of Mr. Alexander's personnel decisions were illegitimate or discriminatory. He argues that Mr. Alexander allegedly made a discriminatory decision to promote Tama Lea Bence to a position for which she was ultimately determined to be unqualified. However, Mr. Edmund does not point to any

9

evidence that she ever was in fact determined to be unqualified, and Mr. Alexander denied making the decision. Despite stating that "the records of the company clearly demonstrate that [Mr. Alexander] was the only person who approved that promotion as demonstrated by his signature on the appropriate forms," Appellant's Brief at 20, Mr. Edmund does not direct us to any company records or forms.

Finally, Mr. Edmund notes that the District Court erred by not discussing the change in composition of the sex of the employees who reported directly to Mr. Alexander over the course of his tenure. Nor did the Court discuss the composition by sex of the candidates available for the positions he ultimately filled. This statistical evidence, he argues, provides further information from which a jury could conclude that Mr. Alexander had a bias in favor of hiring women. However, the fact that the District Court did not choose to mention these particular additions to Mr. Edmund's statistical argument does not mean that they were not considered. The small samples involved make these statistics even less convincing than those for the entire human resources department.

None of Mr. Edmund's arguments regarding the probative value of his statistical evidence is particularly compelling. As the District Court explained, "a raw numerical gender breakdown of a handful of individual, dissimilar employment decisions, the outcomes of which are more favorable to one gender, does not reasonably or logically lead to the conclusion that the decision maker has a gender bias or that a particular employment decision was motivated by gender." J.A. 120. See Bogren v. Minnesota, 236 F.3d 399, 406 (8th Cir. 2000) (noting that statistical evidence "in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision . . .") (citing Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1319 (10th Cir. 1999)) . We agree with the District Court that this evidence "does not pass beyond speculation to the realm of reasonable inference." J.A. 125.

Regarding the numerous complaints filed by many different individuals concerning Mr. Edmund's work performance, Mr. Edmund contends that he produced evidence contradicting the substance of the complaints. For example, he contends that rather than being a "roadblock," as several members of upper management thought, he was in fact creative and innovative. Regarding the complaints of Ms. Stevens and Ms. Book, Mr. Edmund asserts that he resolved any issues between them and that he supported payroll employees. He also asserts that Mr. Alexander agreed that the payroll department did not require his attention to details. Regarding the fact that senior management did not want to use him as a witness, he notes that he was used as a witness on other occasions. Regarding complaints that he was self-interested, he argues that he was misperceived. Regarding his reputation for being unwilling to push the status quo or to furnish creative ideas, he argues that he has provided examples in which he has been innovative. He argues, moreover, that Mr. Alexander's failure to stand up for him in the face of these various complaints is further evidence of discrimination.

These arguments are without merit. Indeed, Mr. Edmund's arguments misconstrue our role in deciding this case. His evidence must do more than merely raise doubts about the wisdom and fairness of the opinions of him held by his superiors and his fellow employees. It must create a real issue as to the genuineness of those perceptions. "Title VII does not prohibit employment decisions based upon . . . erroneous evaluations." Lee v. Minn., Dep't of Commerce, 157 F.3d 1130, 1135 (8th Cir. 1998) (internal citation omitted). Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices. Federal courts do not sit as "super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001) (internal citations omitted).

11

Mr. Edmund contends that by providing examples in which individuals who complained about his performance also supported him and praised his performance in other contexts, he has raised a question of the genuineness of the complaints and thereby generated sufficient evidence of pretext to submit the issue to a jury. For example, he notes that Mr. Levy made the decision to promote him to Manger of Compensation, and gave him positive evaluations and raises. He argues that Mr. Stepien had too little contact with him to draw any general conclusions. He asserts that other senior officers thought well of his performance. None of these arguments, however, suffices to allow a reasonable inference that Mr. Alexander's influence, if any, in the employment decisions concerning Mr. Edmund was discriminatory on the basis of sex. Other than simply attributing gender bias to Mr. Alexander, Edmund does little to establish a reasonable basis for inferring that the numerous complaints lodged against him were anything but genuine, regardless of their accuracy, which is an issue that we need not determine.

## III. Conclusion

For the foregoing reasons, we affirm the District Court's grant of summary judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

12