# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3891

_____

| | | |
|---|---|---|
| Florence Hervey, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| County of Koochiching; Sheriff Duane | * | |
| Nelson, individually and in his official | * | |
| capacity; Undersheriff John Mastin, | * | |
| individually and in his official capacity, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: October 19, 2007
Filed: June 9, 2008

_____

Before RILEY, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Florence Hervey brought a claim pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act, Minn. Stat. § 13.01 *et seq.*, alleging that her employer, Koochiching County, and supervisors Duane Nelson and John Mastin, discriminated against her on the basis of her sex, and retaliated against her for participation in a protected activity. She also brought a state claim against the County for violation of the Minnesota Government Data Practices

Act, Minn. Stat. § 13.02, subd. 7. The district court[1] granted summary judgment in favor of the defendants on all claims. *Hervey v. County of Koochiching*, No. 04-4537, 2006 WL 2990515 (D. Minn. Oct. 20, 2006). We affirm the dismissal of the discrimination and retaliation claims, and remand with directions to dismiss the Data Practices Act claim without prejudice.

I.

Because we are reviewing a grant of summary judgment, we describe the facts in the light most favorable to Hervey. Hervey worked for 25 years as a corrections officer in the Koochiching County Jail. In 2002, she was promoted to the newly-created position of jail administrator. At that time, Sheriff Duane Nelson decided that the jail administrator would report directly to him, rather than to Robert Byman, the undersheriff and second in command.

Hervey, Byman, and Nelson worked without incident for two years. Byman then announced his retirement, and Nelson selected John Mastin to be the new undersheriff. Even before his official start date, Mastin convinced Nelson to change the reporting structure of the department, so that all employees, including Hervey, reported through him. On April 3, 2003, a new organizational chart was distributed to the staff indicating this change.

Hervey objected to the new reporting structure. She e-mailed Nelson, explaining that her job description showed her reporting directly to him, not to the undersheriff. Two days later, Nelson called a meeting with Hervey, Byman, and Mastin. At the meeting, Nelson became upset with Hervey. He told Hervey that her e-mail had made him "so damn mad," that she was "disrespectful," and that he had

---

[1] The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

-2-

received complaints from employees in the courthouse who were concerned that Hervey was trying to run the department. He also told her that the county commissioners wanted to reevaluate the need for a jail administrator. During this exchange, Hervey told Nelson that he had "respectful workplace issues." After an hour, Byman and Mastin left the room and Nelson apologized to Hervey. He gave her a hug and said, "you're going to have problems with [Mastin], aren't you?"

Disputes continued between Hervey and her two supervisors, Nelson and Mastin. On September 15, 2003, Hervey sent an e-mail to the county attorney asking whether it was lawful for her to be driving in a patrol car with a shotgun in it. When Nelson learned that Hervey had sought advice outside of the department without checking with him, he became angry. Nelson and Mastin stormed into Hervey's office and asserted that her action was in direct violation of a departmental directive, which stated that "[p]rior to going outside the department with any departmental concerns, approval shall be obtained from the Sheriff or [Undersheriff]." Nelson also accused Hervey of going behind his back to the county board and county coordinators.

After this incident, Mastin and Nelson gradually reduced Hervey's duties as jail administrator. Shortly after Mastin became the undersheriff, he asked Hervey to provide a written explanation of her job duties, and an explanation of who performed those duties before the jail administrator position was created. Hervey perceived this request as a message that her position was unnecessary. Then, in late October 2003, Mastin told Hervey that he was going to take some of her responsibilities away from her, and transfer them to himself and the sheriff's secretary. Mastin also informed Hervey that she would keep the title of jail administrator, but that the position would be eliminated after she left the department.

During the fall of 2003, the County Board expressed concern that a jail administrator position was not necessary. As an alternative to eliminating the position, Nelson agreed to cut the budget for part-time corrections officers, with a

consequence that Hervey was required to fill some of the lost shifts. Mastin informed Hervey that she must work two hours each day as a corrections officer, starting January 1, 2004, because the department was having budget problems.

On February 6, 2004, Mastin conducted a performance evaluation of Hervey, and gave her mixed reviews. He gave her high ratings for her knowledge of the position and productivity, but low ratings for teamwork, judgment, and dependability. Mastin's overall rating of Hervey was two out of five. He felt that she was supportive of her own staff in the corrections area, but needed to become a team player within the overall department.

Hervey did not agree with Mastin's evaluation. The next Monday, February 9, she decided that she was going to take time off to prepare a formal complaint against Mastin and Nelson. She left a message on Mastin's voicemail on Monday, and told two of her subordinates that she would not be at work on Tuesday. Tuesday night, Hervey again called two of her subordinates to inform them that she would be gone on Wednesday. She asked them to leave a voicemail for Mastin. Hervey did not inform Mastin and Nelson, however, that she intended to file a complaint against them.

Mastin called Hervey at home Wednesday morning to ask why she had not been at work. He claimed that he had not received a voicemail from her, and that he wanted to meet with her on Thursday morning to discuss her absences. At the Thursday morning meeting, Mastin called Hervey a liar, again stating that he had not received a voicemail message. Hervey then told Mastin that she had filed a complaint with the Minnesota Department of Human Services. Mastin told Hervey that when the sheriff returned to the office, the three of them would meet, and Mastin told her he would "suggest to the sheriff that you report to work from now on in brown because you are no longer a supervisor." (Hervey App. 34).

On February 13, Mastin wrote to Sheriff Nelson, recommending that Hervey "continue as Jail Administrator with duties to be reviewed and discussed but wear the same uniform as the other correctional officers." (Hervey App. 174). Mastin opined that Hervey had "many admirable abilities," but that "her leadership and judgment" were inadequate. (*Id.* at 173). He listed six reasons for his recommendation: (1) Hervey's "wearing the white shirt of a supervisor has caused and will continue to cause tension among staff and lower morale within our office and other agencies," (2) the position of Jail Administrator as it had been conducted was not consistent with the formal job description, (3) Hervey failed "to responsibly supervise and provide adequate attention to individuals that were not . . . able to attain the skills to perform their duties," and failed to "provide accurate, timely, and pertinent information required for the safety of the public and officers," (4) Hervey failed "to maintain credibility and integrity with supervisors by repeatedly providing misleading or incorrect requested information, not following directives, [and] causing or provoking situations by being argumentative or threatening," (5) Hervey failed "to work toward a teamwork approach that . . . would support the entire office in its mission to provide security and integrity to [the] community," and (6) Hervey was not "truthful with her supervisor when asked a direct question regarding an absence from work." (*Id.*).

Nelson did not change Hervey's job title or reduce her pay in response to Mastin's memorandum. Hervey points to no evidence that she was prohibited from wearing a white shirt to work, as Mastin had recommended. On February 18, 2004, however, Mastin issued a memorandum, stating that all vacation time, office schedules, and memoranda regarding the agency must be cleared by him. (County App. 190). Mastin stated that the sheriff already had made this clear to him, but in light of Hervey's recent absences, Mastin wanted to make this point clear to Hervey and the rest of the staff. Mastin also took away Hervey's master key, because he was told that Hervey had been in his office while he was not there. Mastin replaced the master key with a key that would open only Hervey's office. In a letter to the county attorney, Hervey's attorney asserted that these actions "completely undermine[d] any

-5-

authority Ms. Hervey has with her subordinates," and "demean[ed] her publicly to her colleagues in all law enforcement agencies that use the law enforcement center." (County App. 188).

On March 2, 2004, Nelson and Mastin placed documentation in Hervey's personnel file of "the oral warning" regarding events of February 10. The memorandum warned Hervey for (1) "not following the directive to properly request leave from your supervisor before taking time off," and (2) "not being truthful to your supervisor regarding the notification of the request for time off." (*Id.* at 122). The notice advised that "[f]urther reoccurrence of these actions will result in discipline," and that the documentation would be removed from Hervey's personnel file in one year, if there were "no reoccurrence." (*Id.*)

In 2005, Nelson and Mastin suspended Hervey twice for insubordination. Each suspension was based on two points: (1) Hervey's failure to meet with Mastin on a daily basis, and (2) Hervey's failure to comply with directives and to meet job expectations. (County App. 7-9, 131-34). As to the former, Nelson and Mastin required Hervey to meet with Mastin each day. Because Mastin felt his job did not lend itself to a set schedule, he asked Hervey simply to stop by his office once each day. Hervey wanted to make an appointment, however, and e-mailed Mastin every day asking what time he would like to meet. Hervey failed to meet with Mastin on several occasions, and Nelson and Mastin ultimately cited this failure when suspending her for five days in March 2005 and fifteen days in July 2005.[2] The

---

[2]Nelson summarized his frustration with Hervey in this way: "You know, their offices are 10 feet apart. And there isn't any reason why they shouldn't be able to meet even if it's just to say, geez, you know, there's nothing going on today . . . it's perfectly quiet, do you have any questions for me. That's what we just asked of her." (R. Doc. 132, Exh. 8, at 152). Mastin, on the other hand, refused to make appointments. The district court aptly summarized the situation: "And 'round and 'round they would go: Two employees, sitting ten feet from each other, tapping away on their keyboards, arguing about how they might meet." *Hervey*, 2006 WL 2990515, at *5.

March suspension notice also cited two specific instances in which Hervey failed to comply with supervisory directives. The July notice cited sixteen specific instances in which Hervey failed to meet the reasonable expectations of her position. The July notice further warned Hervey that if she did not correct her deficiencies and comply with directives, then she would be terminated.

After receiving a right-to-sue letter from the EEOC, Hervey brought this claim, alleging that the defendants violated Title VII and the Minnesota Human Rights Act, because they discriminated against her based on sex, and retaliated against her for taking protected actions. She also brought a state-law claim against the county under the Minnesota Government Data Practices Act ("MGDPA"). Hervey claims that the county violated the act because Mastin, while working within the scope of his employment, disclosed private personnel data.

The district court granted summary judgment on the sex discrimination claims, holding that Hervey had not produced any evidence that Nelson and Mastin acted against her because she was a woman. *Hervey,* 2006 WL 2990515, at * 13. The court noted that "Nelson and Mastin might have been the world's worst supervisors, and they might have run the world's most hostile workplace, but, as long as they did not act against Hervey because she is a woman, they cannot be held liable under Title VII." *Id.* The district court also granted summary judgment in favor of the defendants on the retaliation claim, concluding that evidence of timing – that her adverse employment actions occurred within a short time of her engagement in protected activity – was insufficient to make out a *prima facie* case of retaliation. *Id.* at *16. Alternatively, even if temporal proximity were sufficient to establish a *prima facie* case, the court held that Hervey provided no evidence on which a reasonable jury could rely to find that the defendants' explanations were pretextual. *Id.* The district court granted summary judgment in favor of the county on the MGDPA claim, because it found that Mastin had not acted within the scope of his employment when he disclosed the private data. *Id.* at *17.

II.

We first consider the district court's grant of summary judgment on the Title VII and MHRA claims, which are governed by the same standards. *See Wittenburg v. Am. Exp. Fin. Advisors, Inc.*, 464 F.3d 831, 842 n.16 (8th Cir. 2006). We review the district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to Hervey, the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). We will affirm if no genuine issue of material fact exists and the defendants are entitled to judgment as a matter of law. *Id.* But "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.

Title VII and the MHRA prohibit discrimination against an employee, with respect to compensation, terms, conditions or privileges of employment, because of sex. 42 U.S.C. § 2000e-2(a)(1). Hervey presented no direct evidence of discrimination, so the district court analyzed her claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Because the record has been fully developed in connection with the motion for summary judgment, however, we may now focus on the ultimate question of discrimination *vel non*. *See U.S. Postal Serv. Bd. of Governors v. Aiken*, 460 U.S. 711, 715 (1983); *Riser v. Target Corp.*, 458 F.3d 817, 820-21 (8th Cir. 2006); *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005).

We consider first Hervey's allegation that she suffered an adverse employment action because of her sex. Hervey claims that Nelson and Mastin took away many of her major responsibilities, and suspended her twice without pay, because she is a woman. The defendants argue that these actions were taken because of Mastin's

management style and Hervey's insubordination. Hervey does not dispute that Mastin had a different management style, but instead claims that Mastin never should have been managing her, because Nelson and Mastin cannot change the reporting structure without the approval of the county board. Hervey thus confuses a grievance about internal county management with a claim of discrimination. Whether or not Mastin should have been supervising Hervey, she has no claim under Title VII unless the actions of Mastin or Nelson were based on sex. We see nothing about the alleged lack of authority to change the management structure that supports an inference that subsequent actions taken by the new management team were based on sex.

Hervey also points to Mastin's numerous comments that the jail administrator position was unnecessary as evidence of sex discrimination. She highlights Mastin's comment that "the boys in blue" (referring to the sheriff's deputies) and the "boys in brown" (referring to the corrections officers) "do not think that the position of jail administrator is needed." That Mastin reported that male employees thought the position unnecessary, however, does not support an inference that Mastin acted based on Hervey's sex. It is undisputed that the county was suffering budget difficulties, and that the sheriff's office operated for many years without a jail administrator. In any event, a single comment that merely references gender is not sufficient to create a genuine issue of material fact of sex discrimination. *See Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 809-10 (8th Cir. 2007).

Hervey argues that the defendants' claim that she was insubordinate is a pretext for adverse employment actions based on sex. Nelson and Mastin suspended Hervey twice without pay for acts of insubordination, including her failure to meet with Mastin on a daily basis as directed. Hervey first argues that Mastin's insistence on meeting every day, without scheduling an appointment, was designed to cause failure. She also claims that a jury could find that Nelson directed and encouraged Mastin to be uncooperative in scheduling meetings. She cites testimony of the former undersheriff that scheduling meetings was possible. It may be that Hervey is right and

Mastin is wrong – that scheduling a meeting time each day would have been more efficient. But "[e]mployers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices." *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002) (internal quotations omitted). Hervey has not produced evidence that the personnel actions taken against her were based on sex, rather than on an effort to implement a management directive, whether that directive was sound or unsound as a business practice.

Hervey also claims that similarly-situated male employees were not punished as severely for their misconduct, and that this differential treatment establishes a submissible case of discrimination based on sex. To prove discrimination based on similarly-situated persons of another sex, however, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). Hervey cites two employees that she claims were not punished for similar acts of misconduct: Mastin, and Mastin's step-son, a part-time deputy.

Hervey argues that Sheriff Nelson learned recently that, in 1980, Mastin lied on his application to become a licensed police officer by stating that he had not been convicted of a felony. Hervey claims that Mastin was not suspended for this falsehood, while she was reprimanded for lying to Mastin about leaving a voicemail on his telephone. A comparison of these two incidents does not support an inference of sex discrimination. Even assuming Mastin was not disciplined at all when Nelson learned of the 1980 statement, the two circumstances are substantially different. Hervey was sanctioned for lying to her current supervisor in a manner that was insubordinate; Mastin's falsehood occurred more than twenty-five years ago. The differential treatment of these two dissimilar incidents does not support an inference of sex discrimination.

-10-

Hervey also claims that Mastin was not disciplined for mishandling a disciplinary hearing with another employee, while she was disciplined for a similar incident. This allegation is based on an affidavit of a former employee who claims that Mastin failed to provide union representation for the employee during a disciplinary meeting. Hervey has produced no evidence, however, that this incident was reported to the sheriff or anyone else with supervisory authority over Mastin. Without such evidence, there is no showing that supervisors treated Mastin and Hervey differently for an allegedly similar infraction.

Hervey next contends that Mastin's collective violations of department policy over his career are more serious than her acts of insubordination, but that Mastin has never been suspended without pay. In addition to the allegations above, Hervey claims that Mastin violated department policy when he was involved in domestic disputes, and recently violated Minnesota law by giving his step-son a transcript of a meeting between Mastin and Hervey that was prepared in contemplation of this litigation. The focus of our inquiry, however, is whether other employees were treated differently despite committing the same violations as Hervey: whether they were "involved in or accused of the *same offense* and [were] disciplined in different ways." *Riser*, 458 F.3d at 821 (internal quotation omitted) (emphasis added); *see also Clark*, 218 F.3d at 918. Mastin's off-duty misconduct and other incidents dating to 1980 are not the same as Hervey's recent insubordination while on the job. That the two sets of behavior were treated differently does not support an inference of sex discrimination. As to Mastin's step-son, Richard Mastin, Hervey claims that the department's failure to discipline him for driving while intoxicated shows that management disciplined her based on sex. Again, however, this off-duty misconduct by Richard Mastin is not an offense that is the same or similar to Hervey's insubordination, so the two employees are not similarly situated in all relevant respects for purposes of disparate treatment analysis.

Among a host of other assertions, Hervey also cites her poor performance evaluation, and the requirement that she act as a corrections officer for two hours each day. In each instance, however, Hervey failed to produce evidence linking these actions to sex discrimination. We thus agree with the district court that summary judgment was appropriate on Hervey's disparate treatment claim of sexual harassment.

B.

Hervey next claims that the defendants discriminated against her based on sex by creating a hostile work environment. To establish even a prima facie case of sex discrimination on this theory, Hervey was required to demonstrate that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action. *Nitsche v. CEO of Osage Valley Elec. Co-op*, 446 F.3d 841, 845 (8th Cir. 2006). We agree with the district court that Hervey failed to establish a submissible case of a hostile work environment, because she did not produce evidence that the alleged harassment was based on sex.

Hervey claims that Nelson and Mastin created a hostile work environment by, among other things, constantly criticizing her, requiring her to report to Mastin, and yelling at her on several occasions. As an example, Hervey cites to Nelson's comment that she made him "so damn mad." Even if we assume that Nelson and Mastin's actions were abusive, Hervey must "prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior." *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005). This distinction is important because "Title VII does not prohibit all verbal or physical harassment in the workplace and is not a general civility code for the American workplace." *Id.* (internal quotations omitted). Hervey has failed to produce

-12-

such evidence. She simply recites a list of actions that Nelson and Mastin took against her, and claims they were taken because she is a woman. There is insufficient evidence to support an inference of discrimination. *See Joens v. John Morrell & Co.*, 354 F.3d 938, 941-42 (8th Cir. 2004).

C.

Hervey's final discrimination claim is that the defendants retaliated against her based on protected activity. Federal law prohibits an employer from discriminating against an employee who "has opposed any practice" made unlawful by Title VII, or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under the statute. 42 U.S.C. § 2000e-3(a); *see Barker v. Missouri Dept. of Corrections*, 513 F.3d 831, 834 (8th Cir. 2008). To establish even a *prima facie* case of retaliation, Hervey must demonstrate that (1) she engaged in statutorily protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007). An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation. *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 715 (8th Cir. 2000). A materially adverse action is one that would have "dissuaded a reasonable worker from making or supporting a claim of discrimination." *Burlington N. & Santa Fe R. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (internal quotation omitted). Once again, because the record is fully developed, we need not proceed through each step of the *McDonnell Douglas* burden-shifting framework, but may consider whether Hervey has provided sufficient evidence of retaliation to create a submissible case. *See Riser*, 458 F.3d at 821. The plaintiff in a retaliation case must present sufficient evidence for a reasonable jury to conclude that her protected conduct was a determinative factor in a materially adverse employment action taken by the employer. *Van Horn v. Best*

-13-

*Buy Stores, L.P.*, No. 07-2677, 2008 WL 2151692, at *3 (8th Cir. May 23, 2008); *Carrington v. City of Des Moines*, 481 F.3d 1046, 1053 (8th Cir. 2007).

Hervey claims that she engaged in protected conduct for the first time on April 11, 2003, when she met with Nelson, Mastin, and Byman to discuss the new chain of command. In response to Nelson's comments to Hervey that an e-mail she sent had made him "so damn mad," and that she was "disrespectful," Hervey told Nelson that he was violating the county's respectful workplace policy. The Koochiching County Respectful Workplace Policy prohibits acts of discrimination, but also addresses "rudeness," "angry outbursts," and "disrespectful language," whether or not such actions relate to a protected class. Hervey gave Nelson no indication that the "respectful workplace issues" to which she referred concerned anything more than what she perceived to be rude or angry comments that were inconsistent with the respectful workplace policy. Therefore, we conclude that Nelson and Mastin did not have actual or constructive knowledge of protected activity by Hervey as of April 2003.

Hervey did engage in protected conduct on February 12, 2004, when she told Mastin that she had filed a claim with the Minnesota Department of Human Rights, and thereafter when she participated in the processing of her complaint. Hervey claims that Nelson and Mastin retaliated against her several times, including (1) when Mastin said on February 12 that he would recommend to Nelson that Hervey wear a brown shirt to work because she was no longer a supervisor, (2) two weeks later, when Nelson and Mastin documented an oral warning for failing properly to gain approval for leave, and being untruthful with her supervisor about a request for time off, and (3) in March and July 2005, when Hervey was suspended for insubordinate conduct.

To establish that these actions were retaliatory, Hervey relies principally on the timing of her protected activity and subsequent discipline. Generally, however, "more than a temporal connection between the protected conduct and the adverse

employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). The wisdom of this rule is evident in a case such as this, where the employee was accused of insubordination *before* she notified the employer of her protected activity. Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action. "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). *See also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

On February 12, 2004, Mastin summoned Hervey to his office to address her recent absences. Mastin accused Hervey of taking leave without notifying her supervisor and of lying about leaving him a voicemail *before* Hervey disclosed that she intended to file a discrimination claim. Before the meeting ended, Mastin told Hervey that he would recommend to the sheriff, based on events that occurred well before Hervey engaged in protected activity, that she wear a brown shirt to work because she was no longer a supervisor. Assuming for the sake of argument that Mastin's statement that he would make such a recommendation is a materially adverse action, *but cf. Somoza v. Univ. of Denver*, 513 F.3d 1206, 1215 (10th Cir. 2008), or that Mastin unilaterally demoted Hervey in the meeting while advising her that his recommendation to the sheriff would address only what color shirt she should wear, the action was a logical consequence of Hervey's pre-existing disciplinary problems, and Hervey cannot create a submissible case of unlawful retaliation by interjecting her announcement of a discrimination claim in the middle of a previously scheduled meeting to discuss her absences from work. *See Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 916 (8th Cir. 2006) ("[T]iming alone is insufficient to

show a pretextual motive rebutting a legitimate, non-discriminatory reason for an adverse employment action."). The same goes for the written warning on March 2, 2004; this memorandum simply documented criticisms that Mastin made of Hervey *before* she announced her protected activity. The later suspensions in March and July 2005 were premised on additional insubordinate acts and inadequate performance by Hervey. The mere fact that her discrimination claim was proceeding at the same time is insufficient to create a reasonable inference of retaliation. We reiterate that "anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Kiel*, 169 F.3d at 1136.

While professing to agree that "generally more than a temporal connection is needed" to make a submissible case of unlawful retaliation, *post*, at 21, the dissent proceeds in the next breath to argue that Hervey has indeed established a submissible case based merely on a temporal connection. Hervey is entitled to a jury trial on whether her February 12 "demotion" was due to her filing a complaint of discrimination, it is said, because there is no evidence that "Mastin planned on disciplining Hervey for improperly taking leave before Hervey told Mastin that she would be filing a complaint against him." *Post*, at 23.[3] But the only evidence to which the dissent points in support of this retaliation claim is that which is generally insufficient – temporal proximity. That is, the dissent relies solely on the fact that Hervey disclosed the complaint to Mastin moments *after* Mastin accused her of taking leave without providing advance notice and lying about whether she notified Mastin by voicemail, but moments *before* Mastin told Hervey the consequences of her misconduct. This is insufficient evidence to create a submissible claim of unlawful retaliation. *Green*, 459 F.3d at 916. The defendant does not bear the burden to show

[3]As noted, when Mastin wrote to Nelson to recommend that Hervey be directed to cease wearing the white shirt of a supervisor, the six reasons he cited did not include her improper taking of leave. (Hervey App. 173). The sixth reason cited was Hervey's *untruthfulness* with her supervisor when asked a direct question about her absence from work. (*Id.*)

-16-

that he already intended to administer discipline before the plaintiff interjected protected activity; the burden of persuasion is on the plaintiff to show that more than temporal proximity supports her claim that the employer's legitimate explanation is a pretext for unlawful retaliation. *Id.*

Beyond temporal proximity, we agree with the district court that the record does not support a reasonable inference of retaliation for protected activity. Hervey asserts that Mastin was untruthful in claiming in February 2004 that she dissembled about leaving him a telephone message concerning her intention to take leave. But even if Mastin concocted his version of the voicemail incident, Mastin did so *before* Hervey advised him of her protected activity, so a dispute about Mastin's truthfulness regarding *the voicemail* does not support a reasonable inference of retaliatory motive *for the discipline*. *See Smith*, 302 F.3d at 834. The dissent argues that there is evidence to support a retaliatory motive for the written warning placed in Hervey's file on March 2, 2004, because Hervey disputed whether she violated the office leave policy, and because Mastin conceded that he retroactively granted leave "all the time." Assuming the placement of this documentation in Hervey's file is a materially adverse employment action, *but cf. Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 786 (8th Cir. 2007), the evidence does not support an inference of retaliatory motive for the warning. Whatever Mastin's practice regarding retroactive approval of leave, Hervey was warned based on a combination of occurrences: her failure to comply with the leave policy *and* her false statements to Mastin in trying to justify her absence. She has not produced evidence that Mastin refrained from imposing discipline "all the time," or *any* time, under this confluence of circumstances. Evidence that Mastin declined to warn or discipline other employees under different circumstances does not satisfy Hervey's burden to present proof that she was treated

-17-

differently from other employees who were similarly situated in all relevant respects. *See Phillips v. Union Pac. R. Co.*, 216 F.3d 703, 707 (8th Cir. 2000).[4]

Hervey also disagrees with Mastin's assessment of her insubordinate behavior and poor performance, but her evidence must do more than raise doubts about the wisdom and fairness of the supervisor's opinions and actions. It must create a real issue as to the genuineness of the supervisor's perceptions and beliefs. *See Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000); *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002). The dissent says there is such an issue with respect to the July 2005 suspension, because the manner in which the suspension was implemented – deactivating Hervey's cardkey and notifying staff of the suspension before notifying Hervey – was "humiliating." The strongest support the dissent can muster for this legal proposition is a "*Cf.*" citation to a case involving an entirely different claim of hostile work environment. The dissent appears to mean that Nelson and Mastin deviated from some unspecified norm when they selected the manner of implementing Hervey's suspension. We do not think it is self-evident, however, that a suspended employee must be granted unfettered access to a secure building until she is notified of her suspension from work at the building. And Hervey herself admitted that staff members were notified of the suspension for a legitimate reason, namely, to cover Hervey's work shifts during her suspension. (R. Doc. 125, Exh. B, at 219). Hervey does not assert that the staff notified her of the suspension

---

[4]The dissent further asserts that a warning to Hervey in June 2004 that she made improper use of a county credit card, (Hervey App. 169), is an example of "selective discipline." The credit card incident actually shows the opposite. Corrections officer Gary Loop was warned at the same time as Hervey for improper use of a credit card, precisely because the sheriff's office did *not* want to treat Hervey more harshly than other employees. The dissent points to no evidence that Nelson or Mastin declined to discipline other employees who made improper use of county credit cards to support its assertion that this was discipline that "only happens if Hervey is involved." *Post*, at 26.

in the first instance, or that staff members somehow acted to humiliate Hervey before she was notified of the suspension by her supervisors.

In any event, assuming that the manner of implementing Hervey's suspension may fairly be labeled "humiliating," that fact alone is not probative of retaliatory intent. The supervisors, after all, may have sought to embarrass Hervey because of her insubordination alone, or simply because they were mean-spirited. Neither Hervey nor the dissent points to evidence that Hervey was treated differently in these respects than another similarly-situated employee who was suspended but who had not filed a discrimination complaint. Hervey produced no evidence that any other employee subject to suspension without pay was permitted access to a secure facility through the use of a cardkey on the first day of the suspension. She has not presented evidence that staffing arrangements to account for other suspensions were delayed until after the suspensions formally began.[5]

We do not gainsay the importance of the prohibition on retaliation to the proper functioning of the discrimination laws. An employer may not dissuade employees

_____

[5]The dissent also suggests that our analysis "discounts" the breadth of evidence concerning temporal proximity, and "overlooks" Hervey's supporting evidence, but much of the evidence recounted by the dissent is overstated or simply not supportive of her claim. The dissent recounts, for example, that on July 13, 2005, Hervey requested several vacation days "to attend depositions in this case," but that Mastin denied her request two days after the defendants' counsel received notice of the depositions. The dissent does not assert that Mastin acted with knowledge that a denial of leave would hinder Hervey's ability to prosecute her lawsuit, and Hervey acknowledges that when her counsel later notified Mastin that Hervey sought leave to attend depositions, (R. Doc. 133, Exh. 112), the leave was granted. (Hervey Br. 15-16). The dissent devotes another paragraph to a legal battle over documentation regarding Hervey's suspension, which culminated in the county's claim of attorney-client privilege with respect to any documentation not already disclosed to Hervey. We do not understand how invocation of an evidentiary privilege supports an inference of retaliatory intent.

from invoking the protections of the civil rights laws by retaliating against those who bring discrimination to light. But the cause of action also should not be extended beyond its proper role into an unwarranted regulation of the employer-employee relationship. An employee in trouble with supervisors, and on the verge of disciplinary action, may not insulate herself from discipline by filing a claim of discrimination. Without our insistence that a claim of unlawful retaliation be bolstered by appreciable evidence beyond a temporal connection with the filing of a discrimination claim, an employer seeking to address the problem of underperforming employees could be paralyzed by the fear (or reality) of retaliation lawsuits, and unable to manage its workforce. This analysis does not call for adverse inferences about an employee's motivation or for the limitation of retaliation claims to model employees, *cf. post*, at 28 n.6, but rather implements a background rule, established in *Green*, 459 F.3d at 916, that defines timing alone as insufficient to support a reasonable inference of pretext and retaliatory motive. We think the general rule on temporal proximity is sound, and that it is properly applied in this case. Hervey has failed to produce sufficient evidence to support a reasonable inference of retaliatory motive on the part of her employer. We therefore agree with the district court that she has failed to show a genuine dispute for trial.

## III.

Hervey's claim under the Minnesota Government Data Practices Act was before the district court based on supplemental jurisdiction under 28 U.S.C. § 1367(a). Because we conclude that the district court properly dismissed the federal claims, we remand the case with directions to modify the final judgment so as to dismiss the MGDPA claim without prejudice, so that it may be considered, if at all, by the courts of Minnesota. *See Birchem v. Knights of Columbus*, 116 F.3d 310, 314-15 (8th Cir.1997); *Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir.1997) ("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without

prejudice to avoid needless decisions of state law . . . as a matter of comity and to promote justice between the parties.") (internal quotation and citation omitted).

*       *       *

For the foregoing reasons, we affirm the district court's judgment on the federal and state claims alleging discrimination and retaliation, and we remand the case to the district court with directions to modify the final judgment so as to dismiss the claim under the Minnesota Government Data Practices Act without prejudice.

MELLOY, Circuit Judge, concurring in part and dissenting in part.

I concur in the portions of the majority opinion that affirm the district court's grant of summary judgment as to the sex discrimination claims (Sections II.A and II.B) and that dismiss without prejudice the Minnesota Government Data Practices Act claim (Section III). However, I respectfully dissent from the affirmance of the grant of summary judgment on the retaliation claim (Section II.C). I would find the district court erred by weighing the evidence of retaliation, resolving issues of disputed fact, and ruling as a matter of law that Florence Hervey did not suffer retaliation. The district court found that Hervey failed to establish the third element of a prima facie retaliation case: a causal nexus between the protected conduct and the adverse action. This finding was in error. "The plaintiff's burden at the prima facie case stage of the analysis is not onerous, and '[a] minimal evidentiary showing will satisfy this burden of production.'" Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119 (8th Cir. 2006) (citation omitted).

The majority discounts the breadth of evidence regarding the temporal connection between Hervey's protected conduct and the adverse employment actions and overlooks Hervey's other supporting evidence. The majority looks at the adverse actions in isolation and fails to consider the totality of the circumstances. See Sherpell

-21-

v. Humnoke Sch. Dist. No. 5 of Lonoke County, Ark., 874 F.2d 536, 540 (8th Cir. 1989). While I agree with the majority's statement that generally more than a temporal connection is needed, evidence of temporal connection can be strong evidence of retaliatory intent in some cases. "Viewed within the context of the overall record, temporal proximity may directly support an inference of retaliation, and it may also affect the reasonableness of inferences drawn from other evidence." Wallace, 442 F.3d at 1122. Hervey provided strong evidence of timing and presented a submissible case that is also based on evidence other than temporal connection. "Where reasonable fact finders could extend an inference in favor of the non-moving party without resorting to speculation, we may not declare the inference unjustifiable simply because we might draw a different inference." Id. at 1118. The evidence here does "create a real issue as to the genuineness of the supervisor's perceptions and beliefs," ante at 18, and "support[s] a reasonable inference of retaliatory motive," ante at 20.

As the majority states, Hervey did not go to work February 10-11, 2004. Mastin called her on February 11 to find out why she had not been at work. He claimed that she lied about leaving a voicemail message for him, and he told her they would talk about it the next day. During their February 12 meeting regarding her alleged failure to follow protocol for requesting leave, Hervey told Mastin that she had contacted the Minnesota Department of Human Rights. Mastin responded that Hervey was no longer a supervisor, that he would recommend that Hervey wear a brown shirt (she wore a white shirt, signifying management status), and that when Nelson returned, the three of them would meet. The majority states that "Mastin told Hervey that he would recommend . . . she wear [a different shirt] because she was no longer a supervisor." Ante at 15. Viewing Hervey's declaration in the light most favorable to her, Hervey stated that Mastin demoted her. This was a materially adverse action, and not merely a recommendation. Mastin told Hervey: "I will suggest to the sheriff that you report to work from now on in brown because you are no longer a supervisor." Even assuming that Mastin only recommended Hervey's demotion,

however, an unexecuted recommendation can constitute an adverse employment action in combination with other retaliatory acts.  See Phillips v. Collings, 256 F.3d 843, 849 (8th Cir. 2001) ("[The defendant] argues that her 'draft' evaluation of [the plaintiff], which was never in fact implemented, cannot constitute an adverse employment action because it did not have a tangible effect on his employment duties. While it is true that a draft evaluation alone could not be considered an adverse employment action, *we consider the cumulative effect of [the defendant's] discriminatory actions rather than determining whether any individual action upon which the claim relies was sufficiently adverse*." (emphasis added)).

Significantly, no evidence cited by the defendants supports their argument that Mastin planned on disciplining Hervey for improperly taking leave before Hervey told Mastin that she would be filing a complaint against him.  The district court states that "Mastin informed Hervey of his intention to discipline her before Hervey informed Mastin of her intention to file a complaint."  However, the exhibit that the district court cites for support does not support this statement.  The exhibit merely states that Mastin said, "Well, stop in my office when you come to work tomorrow . . . [t]o discuss this issue."  Culberth Decl. Ex. 89 at 16.  All Mastin told Hervey on February 11 was that "when [Hervey] came into work the next day, he wanted to *talk* to [Hervey.]"  Hervey App. 34 (emphasis added).  Mastin said nothing about discipline or a demotion.

The majority's insistence that "there is no reasonable inference of a retaliatory motive" because "even if Mastin concocted his version of the voicemail incident, Mastin did so *before* Hervey advised him of her protected activity" is unjustified. Ante at 17.  The majority points to no evidence establishing that Mastin definitively planned on disciplining Hervey prior to their meeting.  The majority cites to notes that Mastin made in Hervey's personnel file about the February 12 meeting.  The notes list six reasons for his recommendation that Hervey "continue as Jail Administrator with duties to be reviewed and discussed but wear the same uniform as the other

-23-

correctional officers." Mastin, however, wrote the notes after the meeting, and there is no evidence tending to show he believed any of the reasons warranted discipline prior to Hervey's disclosure of her complaint. According to Hervey, Mastin did not discuss five of the six reasons listed on the note. Accepting Hervey's characterization of the meeting and viewing Mastin's notes in a light most favorable to Hervey, at least two reasonable inferences adverse to the defendants exist. First, Mastin disciplined Hervey solely for her untruthfulness, and because Hervey denies she was untruthful, a jury question exists as to whether the perceived untruthfulness was Mastin's true motivation for the discipline. Second, Mastin retaliated against Hervey for filing the complaint and attempted to conceal his retaliatory motive by listing numerous, facially valid reasons for discipline in the notes.

Contrary to the majority's assertion that Mastin's "action was a logical consequence of Hervey's pre-existing disciplinary problems," ante at 16, his action was not logical because it was the first time that Hervey had been disciplined at all for her alleged insubordination and incompetence. Previously, she had only been given oral reprimands to follow directives and to improve her performance. The sudden demotion was unexpected and came "moments," ante at 17, after Hervey told him she was filing a complaint against Mastin. Further, the notes do not suggest that Mastin had made up his mind to strip Hervey of her supervisory role or to recommend that she not wear a supervisor uniform before Mastin and Hervey met on February 12. The notes are a reflection of his thoughts after the meeting and do not rebut the retaliatory inference. Taken in a light most favorable to Hervey, we may not assume that Mastin's calling of a meeting on February 12 shows a preexisting plan to discipline her. Thus, a material question of fact was raised as to whether Hervey's demotion was due to her failure to request leave properly and alleged lies, or due to Mastin's reasons listed in her personnel file, or due to her filing of the complaint.

On February 18, Mastin took Hervey's master key to the courthouse and replaced it with a key that only opened her office door. He also assumed some of her

-24-

responsibilities: he posted a memo stating that he would approve all vacation and leave requests, office schedules, and memos regarding the agency. The same day, Hervey alleged that her loss of supervisor status was retaliation by Mastin in a letter to the Koochiching County Attorney; she cited the taking of her key and her responsibilities as indications that the situation was worsening. On March 2, Mastin and Nelson called a meeting with Hervey regarding the events of February 10. They reprimanded her for her failure to properly request leave from Mastin before taking time off and for lying to Mastin regarding her request for time off. Mastin and Nelson stated that reoccurrences of these actions would result in discipline. However, Hervey disputes that she violated any procedure for taking time off, and Mastin admitted that he retroactively approved leave "all the time." Given the procedural posture of this case and our duty to view facts favorably to Hervey, we must assume that Hervey properly requested time off.

But even if we assume that she did not comply with the leave policy, a question of fact remains regarding whether Hervey alone was singled out for discipline for retaliatory purposes. See Wallace, 442 F.3d at 1123 ("Viewed in a light most favorable to [the plaintiff], a reasonable jury could find [her supervisor's] adverse and selective application of the policy to be evidence that his reliance on the policy was merely pretext to hide a retaliatory motive."). Although the majority tries to rebut the retaliatory inference regarding selective discipline, ante at 18, the majority and Phillips v. Union Pacific Railroad Co., 216 F.3d 703 (8th Cir. 2000), focus on the amount of evidence of disparate treatment necessary to support a finding of pretext. Phillips, 216 F.3d at 706. In doing so, the majority fails to take the facts in a light most favorable to Hervey, looks at the evidence of disparate treatment as a series of isolated events, and fails to consider the totality of all of the evidence viewed in context. For example, beyond the fact that Hervey was disciplined in the first place, it is significant that she was severely disciplined for violating a policy that Mastin rarely upheld. Further, the majority discounts the gravity of inferences a jury might

-25-

draw if the jury concludes Mastin concocted post-hoc rationales for his actions, as Hervey alleges regarding Mastin's six point memo.

On June 4, 2004, Hervey filed a notice of claim with the Koochiching County Auditor. A fax dated June 21 and addressed to Nelson contained a notice of a charge of discrimination filed with the EEOC. A week later, Mastin disciplined E911/Corrections Officer Gary Loop and Hervey for improper use of a county credit card. Nelson told Loop that Nelson did not want to discipline Loop, but that Nelson had to because of Hervey. Loop stated that "[Nelson] told me that he had been close to reconciling the conflict with Florence Hervey and her then attorney, Bruce Biggins, but that he had gotten angry about what had been said in trying to reconcile the conflict and that, in essence, 'no way was he going to do it now.'" This type of selective discipline—discipline only happens if Hervey is involved—again creates an inference of retaliatory intent towards Hervey. The majority disagrees, ante at 18 n.4, taking the opposite inference: that the incident shows the lack of selective discipline because Loop was also disciplined. But given our duty to resolve inferences in favor of Hervey, I must conclude that this incident shows retaliatory intent.

On July 13, 2005, Hervey requested several vacation days to attend depositions in this case. Although she did not indicate the purpose for her request, the days she requested were the days that depositions, including those of Mastin and Nelson, were scheduled, and the defendants' counsel received notices of the depositions on July 8. Mastin denied Hervey's request two days later. On July 18, Hervey's current counsel wrote to the defendants' counsel regarding the denial and stated that Hervey timely submitted the request and ensured her shifts were covered and that Hervey was unaware of any other such denials of vacation requests by Mastin. Mastin later approved the request without any explanation. A few days after Hervey's counsel's letter, Mastin and Nelson issued a final notice that unless Hervey's performance immediately improved, she would be terminated. They suspended her without pay for fifteen days for failing to meet daily with Mastin and failing to meet job expectations,

citing sixteen specific examples. They also notified her staff of the suspension before notifying her and deactivated her card key such that she could not let herself into the building that morning. The adverse employment actions occurred close in time to the depositions, but even more significant is the humiliating way the actions were carried out: she was the last to know and had to be let into the building she used to run. The humiliation creates a stronger inference of retaliation than the discipline alone. Cf. Brannum v. Mo. Dep't of Corr., 518 F.3d 542, 548 (8th Cir. 2008) ("Rather, whether a work environment is so hostile or abusive as to alter the terms and conditions of employment is to be judged in light of *all* the circumstances, including . . . whether it is . . . humiliating . . . ." (quotation omitted)); Swain v. Spinney, 117 F.3d 1, 8 (1st Cir. 1997) (holding there was a "distinct possibility" in a § 1983 action that the strip search and accompanying sexual humiliation was in retaliation for the individual's non-cooperation and noting the possibility that the search was merely a pretext to humiliate).

The majority's response to the retaliatory inference drawn from the humiliation falls short. The majority comments that Hervey's supervisors may have wanted "to embarrass Hervey because of her insubordination alone, or simply because they were mean-spirited," but this comment is a result of drawing an inference against Hervey, which should not be done at the summary judgment stage.

On August 17, 2005, Hervey met with Mastin and Nelson regarding the suspension. Hervey again requested documentation (she had asked for documentation twice during her suspension) supporting the allegations listed in the suspension letter because she did not understand why she had been suspended. Mastin and Nelson refused, stating that the attorneys wrote the letter and had all the documentation. After ten months and at least one motion to compel, the defendants responded to Hervey's request for documentation on May 17, 2006. They claimed attorney-client privilege and stated that Hervey already had the other listed documents. While the majority sees nothing wrong with this discovery dispute, ante at 19 n.5, I think it is significant

-27-

that it took ten months and judicial intervention before the defendants could respond that they were not producing any additional documents at all. Hervey notes that she never refused to meet with Mastin, and a January 6, 2005, directive stated that she must meet with Mastin every day "unless there is a reasonable cause not to." Hervey argues that she had reasonable cause—either her or Mastin's schedule did not permit a meeting—on each occasion that she failed to meet with Mastin.

The timing of the adverse employment actions—each shortly after developments in the litigation—is important in this case. I believe that the timing and other evidence in this case strongly support an inference of causation for the purpose of the prima facie case. Additionally, this same evidence raises material questions of fact as to whether the defendants' legitimate, nondiscriminatory reasons for the adverse employment actions were pretext. The majority and I argue back and forth on the inferences that should or can be drawn from the facts.[6] When genuine issues

---

[6]In particular, the majority emphasizes the need to protect employers from unscrupulous employees who interject allegations of discrimination or retaliation as shields to "insulate themselves from discipline" after becoming cognizant of their disfavored status in the workplace. Ante at 15. I note two difficulties with undue reliance on this line of reasoning. First, while it is important to point out that this strongly voiced and commonly repeated suspicion of employees' motives may be an important consideration, it is also important to point out that this characterization of employees is difficult to support at the summary judgment stage. It requires courts to make strong *adverse* inferences about the employees' states of mind. In general, I do not believe it is appropriate, at the summary judgment stage, to ascribe such manipulative motives to employees. Second, just as an instance of protected conduct by an employee should not be viewed as an impenetrable shield against future discipline by an employer, the existence of a blemished work record, or an employee's pre-existing status as a less-than-ideal-employee, should not be used as a rug under which employers and courts may sweep claims of retaliation. Our laws against discrimination and retaliation are not in place merely to protect employees with otherwise unblemished records, and we must guard against the establishment of standards that deprive all but the most deserving employees of jury trials. While I share the majority's concern that some employees may attempt to "work the system"

of fact exist, summary judgment is not appropriate.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Our disputes illustrate that the jury needs to decide this issue.  For these reasons, the summary judgment on the retaliation claim should be reversed and remanded for trial.

———————————————————

---

by taking protected actions when they believe discipline is imminent, we should not support granting summary judgment based in large part on suspicions of employees' motives.