Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/14/2017 09:11 AM CDT

DAVID A. OLDFIELD, APPELLANT,
v. NEBRASKA MACHINERY
COMPANY, APPELLEE.
___ N.W.2d ___

Filed April 21, 2017.    No. S-16-526.

1. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

2. ____: ____. An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

3. **Statutes: Judgments: Appeal and Error.** The interpretation of statutes and regulations presents questions of law. An appellate court independently reviews questions of law decided by a lower court.

4. **Termination of Employment.** Unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason.

5. **Summary Judgment.** On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists.

6. ____. Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

7. **Fair Employment Practices: Discrimination.** The ultimate issue in an age discrimination case is whether age was a determining factor in the employer's decision to take the adverse employment action.

8. **Discrimination: Summary Judgment: Evidence.** To survive summary judgment in a discrimination case, the nonmoving party must do more than simply create a factual dispute as to the issue of pretext; he or she must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

9. **Employer and Employee: Discrimination: Proof.** A plaintiff may show discriminatory animus, among other ways, by showing that the employer (1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner, or (3) shifted its explanation of the employment decision.

10. **Fair Employment Practices: Civil Rights: Employer and Employee.** An employee is protected by the Nebraska Fair Employment Practice Act from employer retaliation for his or her opposition to an act of the employer only when the employee reasonably and in good faith believes the act to be unlawful. In order for such a belief to be reasonable, the act believed to be unlawful must either in fact be unlawful or at least be of a type that is unlawful.

11. **Termination of Employment: Public Policy: Damages.** Under the public policy exception to the at-will employment doctrine, an employee can claim damages for wrongful discharge when the motivation for the firing contravenes public policy.

12. **Termination of Employment: Public Policy.** The public policy exception to the at-will employment doctrine is restricted to cases when a clear mandate of public policy has been violated, and it should be limited to manageable and clear standards.

13. ____: ____. In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.

Appeal from the District Court for Lancaster County: Andrew R. Jacobsen, Judge. Affirmed.

Robert F. Bartle, of Bartle & Geier Law Firm, for appellant.

Margaret C. Hershiser and David A. Yudelson, of Koley Jessen, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Cassel, Stacy, Kelch, and Funke, JJ.

Kelch, J.

## I. NATURE OF CASE

David A. Oldfield filed a wrongful termination claim against Nebraska Machinery Company (NMC), alleging that his discharge was in violation of Nebraska's Age Discrimination in Employment Act (ADEA),[1] in violation of the whistleblower retaliation provisions of the Nebraska Fair Employment Practice Act (FEPA),[2] and in violation of public policy. Based on the undisputed evidence of Oldfield's performance issues and the limited evidence offered by Oldfield, we affirm the district court's granting of summary judgment in favor of NMC and against Oldfield on all claims.

## II. FACTS

This matter arises from Oldfield's termination from NMC after 38 years of employment. In his amended complaint, Oldfield seeks damages against NMC for wrongful discharge in violation of (1) the ADEA, (2) the FEPA, and (3) public policy.

After filing an answer, NMC moved for summary judgment, and a hearing was set. At the hearing, depositions of Oldfield and Oldfield's superior, Dwight McDermott, were received into evidence, along with the exhibits used in those depositions. After the hearing, the district court granted summary judgment in favor of NMC.

Because summary judgment requires the court to view the facts in the light most favorable to the nonmoving party, we set forth the facts presented by Oldfield in his complaint and deposition first before reviewing those presented by NMC.

### 1. Facts Presented By Oldfield

At all relevant times, Oldfield held an "at-will" position as a heavy equipment service manager at one of NMC's locations

---

[1] See Neb. Rev. Stat. §§ 48-1001 to 48-1010 (Reissue 2010).

[2] See Neb. Rev. Stat. §§ 48-1101 to 48-1125 (Reissue 2010 & Cum. Supp. 2016).

in Lincoln, Nebraska. During his deposition, Oldfield admitted to having disagreements with his supervisors and not meeting NMC's expectations in certain respects.

### (a) Disagreement About Flat-Rate Pricing

In June 2011, the day before Oldfield was to go on vacation, Oldfield's direct supervisor, Brandon Zobel, called Oldfield into his office to discuss NMC's transition to "flat-rated" pricing, i.e., setting a standard price on doing a certain job. Because Zobel did not have a history in repairs, Zobel asked Oldfield's opinion. Oldfield "tr[ied] to explain to [Zobel] how certain jobs, the way he wanted to do it, couldn't be flat rated." Zobel disagreed, and the discussion became heated. Oldfield then asked Zobel if he should come back after his vacation. Zobel responded, "'That's up to you,'" and Oldfield left.

While Oldfield was on vacation, Kevin Brown, NMC's vice president of services and parts, called Oldfield to make sure he was coming back. Brown told Oldfield that he had been doing a great job and wanted to make sure that Oldfield stayed with NMC.

On June 17, 2011, after Oldfield came back from vacation, he met with Brown to discuss some of the problems that he and Zobel were having together. Then Brown met with Zobel to discuss the problems. Later that day, Zobel arranged a meeting between himself and Oldfield with Brown present. At Oldfield's deposition, Oldfield was given an agenda for that meeting, which reminded him of what was discussed: the issue of the flat-rate jobs, a new process for invoicing work orders, and the hiring of two additional technicians.

They also discussed agenda items, including "Uniform Attire" and "Shop and Office Cleanliness." Oldfield testified that he had problems with NMC's uniform company getting pants that fit him and did not drag on the ground. Although Oldfield had been wearing his uniform shirt, he had not been wearing the uniform pants. Instead, he had been wearing jeans. Another NMC employee had a similar problem finding

a uniform that fit, but McDermott (Zobel's superior) told her not to worry about it. Additionally, the shop that Oldfield managed "wasn't as clean as [Zobel] thought it should be." Brown did not say anything during the meeting.

### (b) Shop Cleanliness

In December 2011, Zobel wrote an email to Oldfield and four other employees, asking them to "work hard to get some 'deep cleaning' done over the next couple of weeks by December 31st." Cleanliness was important to NMC because NMC was a dealer of Caterpillar heavy equipment. Caterpillar has a contamination control policy and would inspect NMC to make sure it was compliant. Oldfield testified that he did not think Zobel's email meant that his shop needed to be completely compliant with Caterpillar's audit standards by January 1, 2012.

On January 18, 2012, NMC conducted a surprise mock contamination control audit. Thereafter, Zobel wrote an email to Oldfield, attaching a list of items that came up during the mock audit. The email stated, in relevant part:

> Your department has made some big improvements over the last few weeks with cleaning the shop. I am very happy about that, but I am disappointed that it wasn't done before January 1st, like I had stated several times during the last several months. That being said, let's move forward and get the items on the attached sheet fixed *immediately*.

Three weeks later, Zobel emailed Oldfield, asking, "How are these items coming along?" According to Oldfield, most of the items had been completed at that point, but there were still some items that needed to be done.

### (c) Monthly Meetings

In October 2011, Zobel wrote an email to Oldfield and two other employees, requesting that they hold monthly meetings with their respective departments. In February 2012, Zobel emailed Oldfield requesting that Oldfield cover "at least a

handful of items" at the beginning of the next monthly meeting. Zobel also wrote, "I was upset by your comment/attitude about the meetings being a waste of time, 'that you [would] rather have them working.'" After Oldfield received the email, he talked to Zobel and told him that he never said the meetings were a waste of time and that he was "joking" when he said that he would rather have his employees working.

### (d) Oldfield's Performance Appraisal

In May 2012, using NMC's performance appraisal form, Zobel assessed Oldfield's performance for 2011 and 2012. The form listed seven different categories: (1) "Managing Others," (2) "Budgetary Controls," (3) "Managing Self," (4) "Organizational Relationships," (5) "Problem Solving," (6) "Performance Standards," and (7) "Safety and Health." Oldfield met or exceeded expectations on 8 of the 10 categories; he was "Below Requirements" on "Managing Self" and "Organizational Relationships." Under each subsection and at the end of the appraisal, there were boxes for Zobel to make comments.

Zobel rated Oldfield as meeting expectations for "Managing Others" and commented, "[Oldfield] is exceptional at getting the most out of his employees. He keeps everybody busy, all of the time. [Oldfield] can do a better job about communicating information to his employees, executing company policies, and promoting teamwork."

Oldfield exceeded expectations for "Budgetary Controls," and Zobel commented, "Historically, [Oldfield] has always been a top performer when it comes to hitting budget and sales numbers. He spends very little and generates a lot of revenue."

Oldfield fell below NMC's requirements for "Managing Self." Zobel commented:

> [Oldfield] does his job well in terms of meeting deadlines / responding to his larger customers. However, it may take several days for him to respond (sometimes no response) to internal emails and/or phone calls. [Oldfield] has been resistant in the past regarding

priorities and organizational changes. Examples include; [flat-rate] jobs, monthly employee meetings, [shop cleanliness], technician training, service writer, wearing his uniform, etc.

Zobel rated Oldfield as exceeding expectations for "Organizational Relationships" and commented, "[Oldfield] does not always execute directives, regardless of personal likes/dislikes. Examples include (same as above) . . . . It is evident that [Oldfield] dislikes speaking orally in groups and avoids it whenever possible. Small to mid-sized customers are not always responded to in a timely manner." In his deposition, Oldfield disputed that small and midsized customers were not responded to in a timely manner. Oldfield explained that "a lot" of small and midsized customers were very happy with the service, but some were upset about the cost.

Oldfield was rated as exceeding expectations for "Problem Solving." Zobel commented: "[Oldfield] solves many problems each and every week. He has a tremendous amount of experience and job knowledge that helps him solve problems quickly and effectively. An opportunity for [Oldfield] would be to participate more in group discussions and provide solutions along with the issues."

Zobel rated Oldfield as exceeding expectations for "Performance Standards" and commented:

> [Oldfield] does give feedback to his employees, and he has been improving on giving positive feedback along with the negative. I believe that [Oldfield's] company best flat variance numbers as well as being a top producer show that he is able to get the most out of his technicians through daily feedback. My only concern is that he needs to familiarize and train other technicians at key customer sites . . . .

Oldfield met expectations for "Safety and Health," and Zobel commented: "For the most part, work is performed safely. More can be done to enforce safety glasses, smoking areas, and seat-belts. However, the number of injuries for

Lincoln's heavy equipment department have been fewer over the past 6 months, which is a definite improvement."

In a section entitled "Manager's Overall Performance Comments," Zobel wrote:

> There is no denying that [Oldfield] produces strong financial numbers and takes care of his larger customers. He works hard to get the most out of his people and is able to take care of a large volume of work each week. His technical problem-solving skills are top notch. [Oldfield] has a hard time adapting to change and follow-through with directives, regardless of personal preference. More improvement is needed in the area of follow-through with internal and external customers. Employee communication and team building needs to improve as well.

Oldfield agreed that he could improve his communication with internal customers (other NMC departments), but disagreed that he was deficient in communicating with external customers.

Under a section entitled "Did employee meet goals/ performance objectives from the previous review period? Why or why not?," Zobel wrote:

> Partially. Financially, [Oldfield] hit it out of the park by finishing $784,348 above budget and $830,347 better than 2010. Last labor to invoice improved dramatically from 13.56 days in May 2011 to as low as 1.64 days in November 2011. This was an impressive improvement. However, [Oldfield] can be very difficult to work with at times due to his resistance to change and slow/ non-existent follow-up at times. [Flat-rate] jobs performance in Lincoln for 2011 was the lowest store at 17.07%. This improved later in the year and into 2012, but progress was still limited for much of 2011. Monthly meetings were few, infrequent, and too short. Contamination control was not made a priority for most of the year; progress required several reminders, emails, and nudges from upper management.

Oldfield explained that Lincoln's flat-rate jobs performance was the lowest store out of NMC's three stores because other stores had smaller equipment that they worked with, so it was easier to apply a flat rate to those jobs. Oldfield testified that he looked at each job to see if flat-rate pricing could be done and that he had been trying to do more.

### (e) Monski Replaces Zobel

In spring 2012, Zobel accepted another position and NMC hired David Monski to replace him as Oldfield's supervisor. Before Monski arrived, Brown and McDermott invited Oldfield to lunch. According to Oldfield, Brown and McDermott thanked Oldfield for a job he had done and mentioned that Monski was coming to Lincoln. During this meeting, McDermott told Oldfield that if Monski did not work or had problems in Lincoln that they would think that there was a problem with the Lincoln store. Oldfield testified that he did not know what McDermott meant by that. Oldfield testified that he could not recall Brown or McDermott saying anything about how either of them expected Oldfield to get along with Monski.

### (f) Failure to Conduct Appraisals

At the beginning of each year, Oldfield and other department managers were to conduct appraisals of subordinate employees and those employees were to conduct self-appraisals. Oldfield testified that most of the years, he completed the appraisals, but that there were some years when not all were completed.

At some point in 2011, McDermott conducted an audit appraisal. After learning the number of incomplete appraisals, McDermott talked to Oldfield outside his office, telling him that the number was unacceptable and that they needed to do better.

In 2012, Monski sent Oldfield several emails about the appraisals. On April 19, Monski emailed Oldfield and another employee, asking, "Do you have your techs self-appraisals

back yet? Or more importantly have you had them complete them yet?" On April 23, Monski emailed Oldfield, asking him if he had received the self-appraisals back. Monski also advised Oldfield that *his* appraisals of the employees were supposed to have been turned in the prior Friday. A few minutes later, Oldfield responded that he was "waiting on 2." On May 15, Monski sent Oldfield an email advising Oldfield that he needed to get his appraisals to Monski before "the 29th" when Monski would be out of the office. Oldfield did not meet the deadline.

Finally, on July 5, 2012, Monski issued Oldfield a written warning for failure to meet the deadline to complete the performance appraisals. This warning was issued after Oldfield had been given three extensions. In the warning, Monski discussed McDermott's audit of Oldfield's performance appraisals and stated that the audit showed that from 2002 to 2011, over 95 percent of Oldfield's subordinates had not received a formal appraisal or other written feedback. Oldfield could not remember the number of appraisals he had not completed, but he thought that 95 percent was too high and that the correct percentage was closer to 50 percent. In the written warning, Oldfield was given a final deadline by which to complete the appraisals so as to avoid "further corrective action, up to and including termination of employment." Oldfield met the final deadline.

Oldfield testified that he had gotten behind on appraisals because the service writer, whose job was to take customer calls and schedule employees for different jobs, did not do a good job and eventually left the position. During the 4 months that the service writer held the position, Oldfield helped him take calls. Oldfield also said that NMC began requiring more online reports in 2010, which took service managers extra time. Oldfield testified that he was not sure if other NMC managers were falling behind on their appraisals, but no other managers had as many subordinates as Oldfield. At that time, Oldfield had approximately 22 to 25 subordinates.

(g) Railroad Service Manager Position

In the last week of September 2012, two NMC superiors approached Oldfield about a railroad service manager position in NMC's railroad division. Although the plan was not ready to be put into effect, Oldfield expressed interest.

(h) September Breakfast Meeting

On September 24, 2012, Monski held a "breakfast gathering" with Oldfield's subordinates; Oldfield was not invited. After the gathering, Oldfield emailed Monski, asking how his subordinates' time for that meeting should be billed. Two minutes after that email was sent, Monski responded, "Just training will work." Oldfield directed his shop clerk to enter the time for his subordinates who had been at the meeting. Oldfield testified that "[o]nce the shop clerk enters [the time,] that [is] the number once and for all." That number "goes into the payroll system, and at the end of the month . . . the payroll checks come out."

On October 3, 2012, Monski sent Oldfield an email stating, in relevant part:

I need to know why your field guy's [sic] billed more than 45 minutes for the "meeting" (breakfast) last Monday. If they are calling it a meeting[,] I guess that is fine[,] but the "meeting" started at 6:30 and was done at the latest 7:10[,] so I expect an answer for this. I am fine paying them for 45 minutes if you feel they must be paid[,] but no more. Surely not 1.5 hours as some of them have billed[,] which should have been caught by you or [your shop clerk] when it was done. If they had nothing to do I expect it to be charged to idle time or whatever they actually were doing but not classroom as the "meeting" was over.

Just a quick FYI in case it happens again, I have bought breakfast for field guys and even lunch in the field, in every location I have been in just because of the job they do with NMC. That was partially the reason

behind this[,] not an official meeting, going behind your back, or any other reason other than to answer any questions they may have[,] as they have evidently been voicing questions and opinions to fellow employees who are bringing it to my attention. They all need to understand if they have a problem or question with what I am doing or what is going on[,] they need to come directly to me versus discussing issues with fellow employees or [customers]. This type of behavior cannot and will not be tolerated. I am also still waiting to hear from you which one spoke with [the customer] in regards to this "meeting" which made it come off negative and need to know today.

There are also other entries in the classroom training work order that have 3 hours and some with overtime. Unless driving to and from class there should be no overtime associated with classroom training only an 8 hour day. You need to [e]nsure your techs and [shop clerk] are aware of this as well as monitoring this weekly so it is caught prior to final invoicing.

Thanks

Eleven minutes later, Monski sent Oldfield another email, stating, in relevant part:

I am still waiting for an answer on the machine which was worked on for H&S Plumbing regarding the good will request.

You state you have no time but then continue to think that by adding another manager to lighten your load is a bad thing. I just do not understand.

You also need to [e]nsure you are staying on top of the steam bay being cleaned up after it is used[,] as well as the shop[,] daily not once a week.

After Oldfield received the email above, he went to talk to Monski in person. Oldfield testified that Monski was upset with Oldfield for paying the employees, because Monski did not consider the breakfast gathering to be a meeting and

thought that the employees should not have been paid. Oldfield admitted that the employees were paid for their time.

Oldfield testified that Monski also let Oldfield's shop clerk know that he was not happy about the employees' being paid for the meeting. According to Oldfield, the shop clerk left her job at NMC because Monski harassed her about this incident.

### (i) Failure to Disclose Name of Employee Who Violated NMC Policy

As stated in Monski's email, an employee had spoken with a customer about the September 2012 breakfast meeting, which was against NMC company policy and a terminable offense. Oldfield knew which employee it was, but refused to disclose the employee's identity to Monski, because Oldfield did not want the employee to get fired.

Monski sent the emails above on a Wednesday. On the following Monday, Monski called Oldfield to his office. When Oldfield arrived, McDermott was also there.

McDermott and Monski gave Oldfield a memorandum advising him of the decision to terminate his employment. The memorandum stated, in relevant part:

> Despite receiving several warnings regarding our behavioral expectations, you continue to behave well beneath our established guidelines. More specifically, you continue to behave insubordinately by failing to follow the reasonable requests of your management team and by failing to manage and support the company's direction with your team, clients and coworkers. As stated in the Performance and Conduct Policy found within the NMC Employee Handbook, "Insubordination, such as refusal to do assigned work, inappropriate language or behavior toward a supervisor/manager" can result in corrective action, up to and including termination of employment. Because you have not illustrated the willingness or ability to cure these matters we have made the decision to terminate your employment.

After the memorandum was read through, Oldfield told McDermott that he knew Monski had mentioned that he was getting close to retirement age but that he did not think he was talking this soon. Oldfield testified that neither McDermott nor Monski responded to this comment, and the meeting ended.

### (j) Monski's Comment About Oldfield's Retiring

Oldfield explained that he made the comment about retirement in response to one comment Monski had made in a meeting approximately 1 month prior. On September 17, 2012, Monski stated that he "'need[ed] to get someone trained to take over for [Oldfield] because one of these days, [Oldfield was] going to want to retire.'"

Oldfield testified that Monski's comment seemed unusual and that it was his experience that having a succession plan within a department was not important to NMC. Oldfield testified that usually, if someone was going to retire from NMC, then the person would tell upper management that they were going to retire and then upper management would decide who was going to take that person's place.

Oldfield admitted that this comment is the sole basis for his age discrimination claim.

### 2. Facts Presented by NMC

After Zobel accepted another position, McDermott and two other NMC employees met with two or three salespeople to discuss matters related to Oldfield. The salespeople expressed concern that Oldfield was not adequately communicating with customers, and Brown and McDermott decided to have a meeting with Oldfield and took him to lunch.

Brown and McDermott talked to Oldfield about the concerns that Zobel had with Oldfield and Oldfield's "attitude of, If it's not my idea, I'm not behind it." According to McDermott, he told Oldfield, "you know, we've had problems with the last branch manager. We're going to bring another guy

in here . . . and if we have the same problems with the new guy, then we know that the problem was not with the previous store manager."

McDermott testified that nothing was put in Oldfield's personnel file about the lunch meeting, because "as long as [Oldfield] had been [at NMC], we wanted to give him every opportunity to change his habits, come around to our way of doing things . . . which was to no avail." McDermott said that Monski also reported problems.

McDermott testified that he was the one who made the decision to fire Oldfield. When asked if he relied upon Monski in making that determination, McDermott responded, "Monski had input, as well as the input that I'd received from . . . Zobel, the input from the meeting with the sales[people]; but, ultimately, the decision to terminate [Oldfield's employment] was mine." However, McDermott also made statements that suggested Monski was also responsible for the decision. For example, when McDermott was asked if a previous safety violation had factored into his decision to terminate Oldfield, McDermott responded, "Not with mine, personally, no." At one point, McDermott also stated that "we made the determination that — I made the determination to terminate" Oldfield's employment.

In response to questions about why Oldfield's employment was terminated, McDermott stated, "It was an accumulation of issues and the fact that it became evident that we were not going to be able to work with . . . Oldfield to get him to the point where we needed him." As reasons for the termination, McDermott cited Oldfield's failure to provide Monski with information, failure to communicate with customers, failure to work with people within his department, failure to train new employees, and failure to keep his shop clean, as well as "his whole attitude of, It's my way, if I don't buy into it, I'm not going to do it."

As an example of failure to train new or student employees, McDermott talked about a new employee who spent months

just washing equipment because, according to Oldfield, "the young kids, they weren't any good."

McDermott also said, "It was a bigger challenge getting the Lincoln location to conform to the [cleanliness] policies on an ongoing basis throughout the year [than] in the other locations," which he attributed to the "fact that . . . Oldfield did not buy into [cleanliness]; so, therefore, it was not important to him, and then it wouldn't be important to his team." Oldfield had told McDermott that cleaning was a waste of time.

McDermott also said that Oldfield was against putting a service writer in the Lincoln location and that he believed the service writer did not succeed because Oldfield did not want him to succeed.

McDermott stated that the "breakfast gathering" issue did not factor into his decision to terminate Oldfield's employment.

When asked how many warnings Oldfield received, McDermott stated that he could not recall the exact number but that there was "a pattern of many of them." He explained, "There would have been warnings like the ones I gave him about [shop cleanliness], the ones . . . Brown and I gave him when we had the [lunch] meeting. [Zobel and Monski] had communicated back and forth with him."

Oldfield was replaced by two employees. McDermott testified that one of them was "probably in his forties" and that the other was in his "late thirties." McDermott was 56 years old at the time of the deposition and still working for NMC.

### 3. SUMMARY JUDGMENT GRANTED

After a hearing, the district court granted summary judgment in favor of NMC and against Oldfield. The district court determined that, even in the light most favorable to Oldfield, the evidence failed to raise an inference that NMC's proffered reasons for Oldfield's termination of employment were merely a pretext for discrimination or retaliation. The district court also determined that Oldfield's claim of wrongful

termination in violation of public policy was duplicative of his age discrimination and retaliation claims.

## III. ASSIGNMENTS OF ERROR

Oldfield alleges that the district court erred in (1) concluding that Oldfield had not presented sufficient evidence to establish a prima facie case for discrimination and retaliation, (2) concluding that NMC offered legitimate reasons for terminating Oldfield's employment, (3) concluding that Oldfield had not presented sufficient evidence of pretext to counter NMC's legitimate nondiscriminatory reasons for his claims of termination due to both age and retaliation, and (4) not giving Oldfield the benefit of every reasonable inference based on the evidence presented in a summary judgment proceeding.

## IV. STANDARD OF REVIEW

[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[3]

[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[4]

[3] The interpretation of statutes and regulations presents questions of law. We independently review questions of law decided by a lower court.[5]

## V. ANALYSIS

[4] Unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may

---

[3] *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

[4] *Id.*

[5] *Id.*

terminate an at-will employee at any time with or without reason.[6] However, we have recognized a public policy exception to the at-will employment doctrine.[7] As noted above, Oldfield alleged in his amended complaint that NMC's decision to terminate his employment violated the ADEA, the FELA, and public policy. On appeal, he claims that the district court erred in granting summary judgment in favor of NMC.

[5,6] On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists.[8] Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[9]

We note that both parties, as well as the district court, have analyzed the age discrimination claim and the retaliation claim using the three-part burden-shifting framework from *McDonnell Douglas Corp. v. Green*.[10] The *McDonnell Douglas Corp.* framework is a procedural device of order of proof and production, designed to force an employer to reveal information that is available only to the employer, i.e., any unstated reasons for the adverse employment action, as well as any discretionary factors underlying its decision.[11]

But, although the burden of production shifts between the plaintiff and the employer, the plaintiff retains the ultimate burden of persuasion,[12] and the ultimate question is

---

[6] *Id.*

[7] See *id.*

[8] *Melick v. Schmidt*, 251 Neb. 372, 557 N.W.2d 645 (1997).

[9] *Strode v. City of Ashland*, 295 Neb. 44, 886 N.W.2d 293 (2016).

[10] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[11] *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 885 N.W.2d 675 (2016).

[12] *Id.*

discrimination or retaliation vel non.[13] Thus, in our review of this summary judgment action, we focus on the ultimate question of whether NMC violated the ADEA, the FELA, or public policy and determine whether the moving party, NMC, satisfied its burden to prove that no genuine issue of material fact exists and whether it produced sufficient evidence to demonstrate that NMC is entitled to judgment as a matter of law.[14] In other words, we consider whether NMC satisfied its burden to show that there is no evidence or reasonable inference that NMC violated the ADEA, the FELA, or public policy.

## 1. ADEA

The ADEA makes it unlawful for an employer to discharge or discriminate against any individual because of such individual's age, unless the reasonable demands of the position require an age distinction.[15] The Nebraska ADEA is patterned after the federal Age Discrimination in Employment Act of 1967,[16] so, in construing the Nebraska ADEA, it is appropriate to look to federal decisions interpreting the federal act.[17]

[7] The ultimate issue in an age discrimination case is whether age was a determining factor in the employer's decision to take the adverse employment action.[18] NMC sought to prove that age was not a determining factor in Oldfield's termination of employment by setting forth evidence of its legitimate and nondiscriminatory reasons for the termination,

---

[13] See, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Billingsley v. BFM Liquor Mgmt.*, 264 Neb. 56, 70, 645 N.W.2d 791, 803 (2002) ("[t]he ultimate issue is whether age was a determining factor in the employer's decision" to take adverse employment action).

[14] See *Melick v. Schmidt, supra* note 8.

[15] § 48-1004(1).

[16] See 29 U.S.C. §§ 621 to 634 (2012 & Supp. II 2014).

[17] See *Billingsley v. BFM Liquor Mgmt., supra* note 13.

[18] *Id.*

namely that Oldfield was having performance issues and was not getting along with his supervisor.

The material facts are not in dispute. Although Oldfield's testimony put certain performance issues and behavioral issues in dispute, Oldfield admitted to a plethora of other issues that NMC had with Oldfield. He admitted, among other things, that during the last few years of his employment, he argued with his supervisor about new policies and procedures, he failed to conform with NMC's uniform policy, he failed to make his shop's appearance comply with upper management's expectations, he did not hold monthly meetings as often as instructed, he needed to improve on communicating with internal customers, he did not complete at least 50 percent of performance appraisals for his subordinates from 2002 to 2011, and he refused to comply with his supervisor's direct orders to disclose the name of an employee who had violated company policy.

[8] Oldfield argues that in light of Monski's comment about Oldfield's retirement, NMC's motivation in terminating his employment is still in dispute. However, to survive summary judgment, Oldfield "must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination."[19] Even viewing the evidence in the light most favorable to Oldfield, we conclude that no reasonable trier of fact could infer that NMC discriminated against him on the basis of his age.

Oldfield admitted in his deposition testimony that the sole basis for his age discrimination claim was a single comment of Monski's that he "'need[ed] to get someone trained to take over for [Oldfield] because one of these days, [Oldfield was] going to want to retire.'" But, one isolated comment about retirement is not enough to demonstrate pretext for purposes

---

[19] See *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998).

of age discrimination.[20] Although "retirement inquiries can sometimes be so unnecessary and excessive as to constitute evidence of discriminatory harassment,"[21] such was not the case here, where Monski made only a single comment.

[9] Instead, there was simply no evidence of discriminatory animus. A plaintiff may show discriminatory animus by showing that the proffered reason for the adverse employment action was pretext for discrimination.[22] The plaintiff may do so, among other ways, by showing that the employer (1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner, or (3) shifted its explanation of the employment decision.[23]

Oldfield claims that he showed NMC failed to follow its own policies when it did not formally document all warnings to Oldfield. However, a review of an exhibit which Oldfield agreed was NMC's company manual shows that NMC did not require itself to document every warning. In fact, the manual states:

> [A]ll of [NMC's] employees are considered to be "at-will" and may be terminated at any time, with or without cause or advance notice. As further detailed below, disciplinary action may include any one or combination of the following steps — verbal warning, written warning, suspension with or without pay or termination of employment. Depending on the severity of the problem and the number of occurrences, [NMC] reserves the right to immediately terminate an employee, even upon a first offense.

Next, Oldfield claims that he showed that NMC "treated similarly-situated employees in a disparate manner" by hiring

---

[20] See, *Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671 (8th Cir. 1998); *Barket v. Nextira One*, 72 Fed. Appx. 508 (8th Cir. 2003).

[21] See *Montgomery v. John Deere & Co.*, 169 F.3d 556, 560 (8th Cir. 1999).

[22] *Hartley v. Metropolitan Util. Dist., supra* note 11.

[23] *Gibson v. American Greetings Corp.*, 670 F.3d 844 (8th Cir. 2012).

"two considerably younger men to assume [Oldfield's] prior position."[24] However, the only evidence of the employees' ages was McDermott's testimony that one was in his "late thirties" and the other was "probably in his forties." Moreover, to be similarly situated, the two employees would have to have performance issues similar to Oldfield. There was no evidence that these employees had performance issues.

Oldfield also claims that he showed pretext because NMC allegedly shifted its explanation for the employment decision. In support of his argument, Oldfield points to McDermott's testimony, which he says "illustrate[s] that there was no specific incident" that led to Oldfield's termination of employment.[25] However, the fact that Oldfield was terminated for "an accumulation of issues," rather than just one, does not mean that NMC has shifted its explanation. Instead, McDermott's testimony was consistent and matches the memorandum that Oldfield received, which explained that the reason he was terminated was because of insubordination and performance issues.

In sum, based on the undisputed evidence of Oldfield's performance issues, we conclude that no reasonable trier of fact could infer from one isolated statement that NMC terminated his employment for discriminatory reasons.

## 2. FEPA

[10] Both federal law and the FEPA make it unlawful for an employer to discriminate against its employee on the basis of the employee's opposition to an unlawful employment practice.[26] We have said that "[a]n employee is protected by FEPA from employer retaliation for his or her opposition to an act of the employer only when the employee reasonably

---

[24] Brief for appellant at 8, 16.

[25] *Id.* at 17.

[26] See, 42 U.S.C. § 2000e-3(a) (2012); § 48-1114.

and in good faith believes the act to be unlawful."[27] In order for such a belief to be reasonable, the act believed to be unlawful must either in fact be unlawful or at least be of a type that is unlawful.[28]

After reviewing the pleadings and the evidence presented, we conclude that NMC did not engage in an unlawful practice; that Oldfield could not have reasonably believed that NMC was engaging in an unlawful practice; and that even if Oldfield had established that he reasonably believed the act to be unlawful, he failed to show that his termination was causally connected to his alleged reporting of an unlawful practice.

As noted by the district court, "[t]he crux of Oldfield's claim is that he was terminated after reporting alleged violations of the federal Fair Labor Standards Act with respect to non-payment of wages to his subordinates for their time spent at a breakfast meeting with NMC manager . . . Monski." However, Oldfield admits that the employees were actually paid for that meeting, so clearly, there is no evidence that NMC engaged in an unlawful practice.

And Oldfield could not have reasonably believed that NMC was engaged in an unlawful practice. After the breakfast meeting, Oldfield sent Monski an email asking how the time should be recorded and Monski responded, "Just training will work." Oldfield then instructed his shop clerk to enter the time for his subordinates. Oldfield admitted that once the shop clerk enters the number of hours for the subordinates into the payroll system, then that is the number of hours for which the subordinates will be paid. Accordingly, the evidence shows that the subordinates were lawfully paid and Oldfield could not have reasonably believed that they were not.

Moreover, the evidence does not reflect a causal connection between Oldfield's alleged reporting of an unlawful

---

[27] *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 61, 662 N.W.2d 599, 605 (2003).

[28] *Id.*

practice and his termination of employment. Oldfield alleges that in addition to the evidence of pretext, which we rejected above, his evidence of temporal proximity (approximately 3 weeks) shows that there was a nexus. However, generally, a temporal connection between the protected conduct and the adverse employment action by itself is not enough to present a genuine factual issue on retaliation.[29] This is especially true where, as here, the evidence shows that the employer was concerned about a problem *before* the alleged protected conduct occurred.[30] Here, Oldfield admits that prior to his alleged protected conduct, he had, among other things, argued with his supervisor about new policies and procedures, failed to make his shop's appearance comply with upper management's expectations, failed to hold monthly meetings, failed to sufficiently communicate with internal customers, and failed to complete at least 50 percent of performance appraisals for his subordinates from 2002 to 2011.

In light of this evidence, and the fact that Oldfield's act of insubordination (failing to disclose the name of the employee who violated company policy) was within 2 days of his termination, we conclude that no rational jury could find that Oldfield's termination was a result of retaliation. Therefore, the district court properly granted summary judgment in favor of NMC with respect to the retaliation claim.

## 3. Public Policy

[11-13] Under the public policy exception to the at-will employment doctrine, an employee can claim damages for

---

[29] *Hervey v. County of Koochiching*, 527 F.3d 711 (8th Cir. 2008) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131 (8th Cir. 1999)).

[30] See *id.* (quoting *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827 (8th Cir. 2002), and citing *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise")).

wrongful discharge when the motivation for the firing contravenes public policy.[31] The public policy exception is restricted to cases when a clear mandate of public policy has been violated, and it should be limited to manageable and clear standards.[32] In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.[33]

In Oldfield's amended complaint, he alleges that his termination of employment violated Nebraska common law and Nebraska public policy "against employers discharging employees from such a tenured position for unjustifiable reasons." But the "unjustifiable reasons" proffered by Oldfield are the same as his statutory reasons, i.e., that his termination of employment was a result of discrimination on the basis of his age and also retaliation for reporting an allegedly unlawful activity. In this respect, Oldfield's claim is duplicative of his ADEA and FELA claims, which we have already addressed and found to be meritless. Therefore, the district court properly granted summary judgment in favor of NMC with respect to Oldfield's public policy claim.

## VI. CONCLUSION

For the foregoing reasons, we conclude that Oldfield's assignments of error are without merit. We therefore affirm the judgment of the district court, granting summary judgment in favor of NMC and against Oldfield.

AFFIRMED.

MILLER-LERMAN, J., not participating.

---

[31] *Coffey v. Planet Group, supra* note 3.

[32] *Id.*

[33] *Id.*